This is a suit under the Workmen's Compensation Act, Act No. 20 of 1914, wherein plaintiff alleges that the defendant, on November 20, 1941, and prior and subsequent thereto, was engaged in operating *Page 86 
a farm in connection with which there were power-driven machines and other hazardous appliances or equipment; that on that date the plaintiff was employed by the defendant as a hostler, with duties which were partly hazardous and partly non-hazardous; and that while acting in his capacity as hostler in the driving of mules from the main stable lot to the pen, he attempted to strike an unruly mule with an 8-plait whip, and that in some unaccountable and accidental manner the cracker attached to the end of the whip struck him in his right eye, causing loss of sight in said right eye for all practical purposes.
The prayer is for compensation, with legal interest, for 100 weeks, for the loss of an eye (with an alternative prayer for lesser compensation if it be found that the vision in the eye is not completely destroyed) plus medical expense in the amount of $250, less $50 credit thereon, plus all costs.
It is admitted that plaintiff did suffer the total loss of his right eye, for all practical purposes, as a result of accidentally striking his eye with the cracker of a whip while cracking the whip at the time and place alleged. It is further admitted that he was employed as hostler by the defendant on the date of the accident, at the wage alleged. The defense is that his employment did not include the penning of the mules, either directly or indirectly, and did not include the use of a whip, and that consequently plaintiff's injury was sustained outside the course and scope of his employment, and therefore that the defendant is not liable therefor.
After hearing the case, the trial court rendered judgment in favor of the defendant and against the plaintiff dismissing plaintiff's suit at his cost. The plaintiff has appealed.
The case presents purely a question of fact. It will be noted that the evidence is quite contradictory and presents the question as to which of the witnesses are to be believed.
The plaintiff testified that he was employed by defendant for about two and one-half or three years as hostler, and that as such, he was the mule lot keeper and that he was told by his employer that he would have to do everything that had to be done in the lot, including driving the mules from the main lot into the catch pen. He testifies that he was hurt on the afternoon of November 20, 1941, while using a regular six foot four-ply teamster's whip in driving the mules from the main lot into the catch pen; that he found that whip at the plantation when he first went to work, and that he used it every day. He states further that the accident occurred while Mason Hilliard, a teamster, was at the lot repairing a broken bridle. The evidence is to the effect that Mason Hilliard was the only person in the mule lot at the time of the accident.
Mrs. Murphy Comeaux, plaintiff's daughter, testified that it was her father's duty to drive the mules into the catch pen, both morning and evening, and that on several occasions she had actually seen him do this, and his son-in-law, Murphy Comeaux, testifies to the same effect.
Plaintiff introduced Joe Manuel as a witness, with the apparent purpose of showing that Manuel at various times had walked by the mule lot and had seen plaintiff penning the mules, but, though plaintiff's attorney pleaded surprise, all he could get out of this witness was that he never paid attention to Mr. Laine in the mule lot, and knew nothing about the matter.
Plaintiff next introduced Leon Green, plaintiff's predecessor as hostler for defendant, who testified that at the time of the trial he was employed on the Moresi Plantation, where, in his capacity as hostler, he sometimes, when he felt like it, drove the mules from the main lot into the catch pen, and that in doing so, he used a whip. He further testified that when he worked for Mr. Junca, the defendant, as hostler, he sometimes used a whip to drive the mules into the stable, but that he did not use his whip in driving the mules from the lot into the catch pen, because he had the help of a plow man or water boy as a rule. He states that this help was extended to him voluntarily and that the penning of the mules during his employment by Mr. Junca for some two years, was his job; that Mr. Junca had hired him as hostler and that his duties were to tend to the mules, feed and pen them up.
Plaintiff then introduced the testimony of Carlton Guillory, who testified that he worked for the defendant after plaintiff was hurt and that he would take plaintiff's place as hostler when plaintiff was *Page 87 
away; that on two or three mornings while replacing plaintiff, he drove the mules into the catch pen, but denies that he was ever told by plaintiff to do this, and states that ordinarily the water boy (Son Johnson) drove the mules into the catch pen.
Plaintiff then introduced Frank Picard, who testified that he had gone with plaintiff to interview three witnesses, including Joe Manuel and Carlton Guillory; and that Joe Manuel stated to plaintiff in his presence that he had seen plaintiff drive the mules from the main lot into the catch pen in the early hours of the morning. He stated that Carlton Guillory told plaintiff that his duties as hostler, when he replaced plaintiff, included the driving of the mules into the catch pen.
The above constitutes plaintiff's proof on the question of whether or not he was in the course of his employment when he sustained his accident (subject to rebuttal).
The defendant's case is based on the following testimony:
Lawrence Chanette testified that while plaintiff was employed by defendant he was also working for defendant as water boy and pen-up man and that his duties included the penning of the mules in the morning and at twelve o'clock during three months in the summer.
James Washington testified that he worked for defendant for one summer as water boy and that his duties included the penning of the mules and that he never saw the plaintiff drive the mules from the lot to the catch pen.
John Ledet, Sr., testified that he worked as water boy during the time that plaintiff was employed and that his, Ledet's, duties included the penning of the mules and that plaintiff had nothing to do with that as far as he knew.
Fritz Ledet testified that at the time of the trial he was employed by defendant to feed the mules, saddle the horses, and milk the cows, and that his duties did not include penning the mules, which is done by the water boy, Son Johnson, in the summer time, and Mason Hilliard in the winter time.
Son Johnson testified that as water boy it was his duty in the summer time to put the mules in the catch pen and that he was sometimes helped by the head teamster and that in the winter the mules were penned by the cane loader, Mason Hilliard, and that plaintiff had nothing to do with the penning of the mules.
Joe Armelin testified to the same effect as Son Johnson, that it was the duty of the water boy and the cane loader to tend to the penning of the mules, and that plaintiff had nothing to do with that.
Joe Savoie, a merchant, testified that he was the one who recommended plaintiff to the defendant for employment, and that defendant told him that he needed a combination hostler and blacksmith and that he was willing to get the water boy to pen up the mules and to clean the stable if plaintiff could do the combination job.
James Stewart testified that he was employed on defendant's plantation to plow, hoe, ditch, etc., and that during the grinding season it was the duty of the cane loader, Mason Hilliard, to drive the mules in the catch pen.
Edward Lockett testified that he was employed by defendant as a tractor operator and that when plaintiff got hurt he was asked to take his place and was told what his duties were to be, which did not include penning the mules, which latter duty was being performed by Mason Hilliard, the cane loader.
George Jones testified that he was head teamster for defendant during part of 1940 and 1941 and that at that time the mules were being driven into the catch pen by the water boy, Son Johnson, and the cane loader, Mason Hilliard.
Mason Hilliard testified that it was the duty of the water boy to tend the mules in the summer and his duty as cane loader to pen them in the winter time; that on the day of plaintiff's accident he, Hilliard, was in the act of driving the mules from the stable into the catch pen and that the plaintiff was in the back of the stable popping a whip; that he, Hilliard, in order to make the mules leave the stable, hit or struck at the side of the stable, towards the front thereof, as shown by diagram in the record, and that the mules thereupon came out of the front of the stable and he followed them, driving them towards the gate of the pen and into the pen, and that plaintiff followed behind him and told him that he had injured his eye while popping the whip. He denies that the plaintiff had anything to do with penning the mules and denies that he, Hilliard, had a broken bridle which he was repairing, as testified by plaintiff. *Page 88 
Mr. Junca, the defendant, testified that he needed a combination hostler and blacksmith, and that on the recommendation of Mr. Savoie he hired the plaintiff, with the understanding that the water boy would pen the mules and clean up the stable; that after two months he discovered that plaintiff could not do blacksmith work and that he thereupon reduced his wage 10 cents per day and gave him the additional duty of cleaning the stable, but that he at no time employed him for the purpose of penning the mules and at no time knew that he had or used a whip, which was unnecessary to his duties. He states that the only hostler he ever had who had the duty of penning the mules was Leon Green.
The only rebuttal testimony is the testimony of plaintiff himself, who merely repeats that he was using a regular teamster's whip in driving the mules and states that the testimony of defendant's witnesses that he had never driven the mules into the catch pen is not true, and he adds that he had always driven the mules, except during the two months when he acted as blacksmith.
From the above summary of the testimony, it is apparent that we cannot believe that plaintiff was acting in the course and scope of his employment, unless we disregard the testimony of the defendant and his witnesses. The trial judge was, of course, in a much better position than we are to determine whether this should be done. He states that the testimony of some of the witnesses was contradictory on some insignificant points which he attributes to the fact that these witnesses were uneducated negroes and were subjected to rigid cross-examination. He blames their inconsistency in minor details to their inability to express themselves. He came to the conclusion that the accident or injury of which plaintiff complains did not happen out of and in the course of his employment. In the light of the evidence, we cannot find any manifest error in his finding of fact.
Under such conclusion of fact, the judgment of the lower court will be affirmed on the ground that the plaintiff has failed to prove that the accident of which he complains happened "out of and in the course of his employment" and that, even if, as contended by plaintiff, the defendant had the burden of proving the defenses which he made in his answer (with which contention we do not agree) the defendant has sustained such burden of proof and has established that the duties of the plaintiff did not include that of driving the mules from the stable to the catch pen.
The case of Dartez v. Sterling Sugars, Inc., 7 La.App. 414, can be easily differentiated from this case. In that case, the driver of the cart was required to be present, at that time, where the accident happened. In our case, the preponderance of the evidence is to the effect that plaintiff was not required to be present in the lot nor in the rear of the barn at the time of the accident. In that case, the record showed that Boutte, the engineer in charge of the cane derrick, accepted the services of deceased without objection and which services were in line with the help or assistance that had been given by the teamsters in many instances for the operation of the derrick. The court says, "His (Boutte's) acceptance of the help of the deceased was equivalent to a call upon him by Boutte, and the services which were thus being rendered by Dartez (decedent) under the facts and circumstances of the case, fell within the scope of his employment, as he was thus engaged in the discharge of a function or duty, which he was authorized to undertake, and which was calculated to further, directly or indirectly, his master's business." Such is not the case at bar. In our case, plaintiff was not required to be at the stable lot at that time, and he was not accustomed to help in the driving of the mules to the catch pen; the employee whose business was to drive the mules to the catch pen was performing his duties and he did not need any help nor did he solicit any help and particularly plaintiff's help. If plaintiff was cracking the whip in helping the employee, which we seriously doubt, then he was voluntarily doing something he was not authorized to do, and was not doing anything in the furtherance of defendant's interest.
Judgment affirmed. *Page 89